1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                      **FOR THE DISTRICT OF ARIZONA**

8

9    Peter Picurro,                          )    No. CV 09-00938-PHX-NVW (LOA)
                                             )
10              Plaintiff,                   )    **ORDER**
                                             )
11   vs.                                     )
                                             )
12   James Baird, et al.,                    )
                                             )
13              Defendants.                  )
                                             )
14                                           )
                                             )
15   _____

16          Plaintiff Peter Picurro brought this civil rights action under 42 U.S.C. § 1983

17   against multiple Arizona Department of Corrections (ADC) employees (Doc. 1).  Before

18   the Court are Defendants' Motion for Summary Judgment (Doc. 69) and Motion to Strike

19   Plaintiff's sur-reply (Doc. 81).

20          The Motion to Strike will be denied, and the summary judgment motion will be

21   granted.

22   **I.     Background**

23          Plaintiff's claim arose during his confinement at the Arizona State Prison

24   Complex-Florence South Unit (Doc. 1 at 1).[1]  He named as Defendants (1) Health

25   Services Director James Baird, (2) Physicians' Assistant (PA) Nick Salyer, (3)

26   Supervisory Nurse Caron Grant-Ellis, (4) Facility Health Administrator (FHA) Bruce

27   _____

28          [1]Plaintiff was released from prison in May 2009, shortly after he filed this lawsuit
     (Doc. 4).

McMorran, and (5) Correctional Officer (CO) III Schmidt (id.). Plaintiff alleged that Defendants violated the Eighth Amendment because they were deliberately indifferent to his medical needs and failed to provide adequate medical care for his skin cancer (Count I) and his high triglyceride levels (Count II).

Defendants have moved for summary judgment on the grounds that (1) Plaintiff's conclusory allegations fail to establish any genuine issues of material fact, (2) Defendants were not deliberately indifferent to Plaintiff's medical needs, (3) Plaintiff has not suffered substantial harm, (4) Plaintiff's official-capacity claims are barred, (5) Plaintiff's claim for punitive damages should be dismissed, and (6) Defendants are entitled to qualified immunity (Doc. 69). Defendants also argue that Plaintiff's claim for injunctive relief is moot (Doc. 69 at 7-8), and Plaintiff concedes that it is (Doc. 75 at 1).

Plaintiff filed his response in opposition to the motion (Doc. 75), and Defendants submitted their reply (Doc. 79).[2] Plaintiff then filed a sur-reply (Doc. 80), which Defendants moved to strike (Doc. 81).

**II.    Motion to Strike**

Defendants' Motion to Strike will be denied. See RDF Media Ltd. v. Fox Broadcasting Co., 372 F. Supp. 2d 556, 566 (C.D. Cal. 2005) (motions to strike are generally disfavored). The arguments raised in Plaintiff's sur-reply do not affect determination of the issues addressed; thus, there is no prejudice to Defendants.

**III.   Summary Judgment Legal Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Under summary judgment practice, the movant bears the initial responsibility of

---

[2]In their reply, Defendants argue that Plaintiff's response is untimely and should not be considered because the deadline for filing was March 14, 2011 (the March 12 deadline fell on a Saturday), but Plaintiff did not file his response until March 15, 2011 (Doc. 79 at 1-2). Defendants cite no prejudice to the Court accepting a 1-day-late response. The Court will consider Plaintiff's response memorandum.

presenting the basis for its motion and identifying those portions of the record, together with affidavits, that it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323.

If the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 250 (1986) ; see Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted); see Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence, and draw all inferences in the nonmovant's favor. Id. at 255.

**IV.   Facts**

With their summary judgment briefing, Defendants submit an extensive Statement of Facts (DSOF), which is supported by 450 pages of exhibits—including declarations and copies of grievance documents, Health Needs Requests (HNRs), and medical records(Doc. 70, Exs. A-J).[3] Plaintiff submits a corresponding Statement of Facts

---

[3]Defense counsel is notified that in the future, she must comply with the District of Arizona Case Management/Electronic Case Filing (CM/ECF) Administrative Policies and Procedures Manual, which requires that courtesy copies be printed from CM/ECF (to reflect the page number) and that they comply with all requirements in Local Rule of Civil Procedure 7.1. See Manual, § 3 (Policy on Courtesy Copies for Chambers). Specifically, LRCiv 7.1(b)(1) states that all paper documents must be stapled or, if the documents are too large for stapling, they must be bound with a metal prong fastener at the top.

(PSOF)[4] and supporting exhibits (Doc. 76, Exs.).[5]  Much of DSOF, which documents in great detail Plaintiff's healthcare from 2005-2010, describes treatment and medication for back and neck pain, acid reflux, and other conditions unrelated to Plaintiff's claims.  As such, it made determining whether Defendants were deliberately indifferent to Plaintiff's medical needs stemming from his skin cancer and high cholesterol much more burdensome.

The relevant facts are summarized as follows, with factual assertions addressing skin cancer and high cholesterol treatment listed separately in an attempt to make the facts somewhat more coherent.

Plaintiff was in ADC custody in the Florence South Unit from May 2007 until May 2009 (DSOF ¶¶ 1-2; PSOF ¶¶ 1-2).  To obtain medical care, ADC procedures require an inmate to first submit an HNR informing staff of his medical need (DSOF ¶ 29; PSOF ¶ 29).  The inmate is then seen on the Nurse's Line for assessment and possible referral to see a healthcare provider (HCP) (id.).  If the inmate is referred to an HCP, he is given an appointment—also known as placement on the Doctor's Line (DSOF ¶ 30; PSOF ¶ 30).  The urgency of an inmate's condition is considered in determining when an inmate is placed on the Doctor's Line (id.).  If the inmate requests a certain type of treatment, he must first meet with the HCP, who then determines whether the requested treatment is within protocol; the HCP then makes a recommendation to the Medical Review Committee (DSOF ¶ 31; PSOF ¶ 31).  A decision to seek an outside consultation or treatment is at the sole discretion of the inmate's HCP (id.).

---

[4]Defendants argue that, although Plaintiff set forth corresponding paragraphs indicating a dispute or agreement with each of Defendants' 155 paragraphs in their DSOF, he failed to cite specific evidence supporting his dispute with 3 paragraphs and thus failed to comply with LRCiv 56.1; they submit that these paragraphs in DSOF must be deemed admitted (Doc. 79 at 2, ref. to PSOF ¶¶ 16, 18, 42).  The Court declines to automatically deem those paragraphs admitted.  To the extent that any of these three paragraphs may be material, they will be specifically addressed in the Order.

[5]Defendants object to and move to exclude one of Plaintiff's exhibits (Doc. 79 at 2, ref. to Doc. 76, Ex. OP2).  Because the Court does not consider this exhibit in its analysis, the objection is overruled and the request to exclude the exhibit is denied as unnecessary.

If an inmate submits an inmate letter—the first step in the grievance system—that concerns medical care, it goes to the medical unit, where the FHA forwards it to appropriate medical personnel to draft a response (DSOF ¶ 32; PSOF ¶ 32).  The FHA reviews the draft response to ensure that all issues have been addressed, then signs it and sends it to the inmate (id.).

## A.    Skin Cancer Treatment

On May 30, 2007, Plaintiff submitted an HNR seeking a skin evaluation on his nose, a biopsy of a skin tag on his neck, a straw hat, and long-sleeve shirts; he explained that he previously had a precancerous lesion on his nose (DSOF ¶ 34; PSOF ¶ 34).  An appointment was made with an HCP, and on June 12, 2007, Salyer saw Plaintiff (DSOF ¶¶ 34-35; PSOF ¶¶ 34-35).  Salyer noted that Plaintiff was positive for actinic keratosis (precancerous skin-cell changes) on his face and arms (DSOF ¶ 35; PSOF ¶ 35).  He scheduled Plaintiff for the dermatology line (Derm Line) for liquid nitrogen treatment and authorized a hat and long-sleeve shirts (id.).

On July 8, 2007, Plaintiff submitted an HNR complaining about a painful 1/4 inch inflammation above his lip; he explained that he was predisposed to skin cancer (DSOF ¶ 38; PSOF ¶ 38).  Plaintiff was scheduled for the Nurse's Line, and saw Grant-Ellis on July 10, 2007; she treated Plaintiff for a cold sore on his lower lip (DSOF ¶¶ 38-39; PSOF ¶¶ 38-39).

In response to his May 30, 2007 HNR that requested a skin evaluation on his nose and a biopsy of a skin tag on his neck, Plaintiff was told by medical that he was scheduled for the next cryosurgery (Doc. 70, Ex. E, Ex. 2).[6]  On September 13, 2007, Plaintiff went to the medical unit for cryosurgery; he waited 5 1/2 hours only to be told that he would be seen on a later date in 3-6 months (id.).  Plaintiff filed an inmate letter to complain about this incident and the lack of medical care (id.; DSOF ¶ 48; PSOF ¶ 48).  On October 5, 2007, CO III PerezCerros responded to the inmate letter; he informed Plaintiff that he

---

[6]Cryosurgery is a procedure using liquid nitrogen or carbon dioxide as an agent to destroy tissue.  Stedman's Medical Dictionary cryosurgery (27th ed. 2000).

spoke to Grant-Ellis, who stated that PA Salyer normally takes care of such issues and "that had [Plaintiff] followed their direction, [he] would have been scheduled for the very next time the procedure was done without having to wait for a long time" (Doc. 70, Ex. E, Ex. 2). Grant-Ellis advised that Plaintiff should submit an HNR to request treatment (DSOF ¶ 48; PSOF ¶ 48). Plaintiff filed an inmate grievance (the second step in the grievance process) on October 15, 2007; he stated that he has been trying to get a biopsy since May 30, 2007, and was told on September 13, 2007, that he would be rescheduled in 3-6 months, which he stated was intolerable (Doc. 76, Ex. G2; DSOF ¶ 125; PSOF ¶ 125). The grievance response from McMorran informed Plaintiff that the September 13, 2007 appointment was canceled because the provider was requested to cover at another facility and he apologized for the delay (DSOF ¶ 126; PSOF ¶ 126). Plaintiff appealed this response to the ADC Director; in the March 4, 2008 appeal response, the Director upheld Plaintiff's grievance and directed that he receive cryosurgery within the next 30 days (DSOF ¶ 127; PSOF ¶ 127).

While Plaintiff's grievance was pending before the Director, McMorran responded to an inquiry from Central Office Health Services about whether Plaintiff received cryosurgery in 2007 (Doc. 70, Ex. C, Ex. 7). On February 15, 2008, McMorran asked a nurse to review Plaintiff's chart for information requested by Central Office (DSOF ¶ 65; PSOF ¶ 65). On February 20, 2008, PA Brand in the Health Services Bureau instructed McMorran to schedule Plaintiff for cryosurgery within 30 days (DSOF ¶ 67; PSOF ¶ 67). McMorran e-mailed Salyer this information (id.).

Also on February 20, 2008, Baird responded to Plaintiff's inmate letter about pre-cancerous skin lesions (DSOF ¶ 68; PSOF ¶ 68). Baird responded that appropriate staff had been contacted and Plaintiff would be scheduled to meet with his HCP to resolve the issue (id.).

On February 28, 2008, in response to Plaintiff's inmate letter about another medical condition, Salyer told Plaintiff that he needed actinic keratosis treatment with liquid nitrogen (DSOF ¶ 69; PSOF ¶ 69).

On March 2, 2008, a biopsy was performed by Dr. Phan on Plaintiff's left cheek (Doc. 70, Ex. D, Ex. 32).

On March 15, 2008, Plaintiff submitted another inmate letter regarding his pre-cancerous skin lesions and high cholesterol (DSOF ¶ 77; PSOF ¶ 77). In response, Baird informed Plaintiff that his issues were previously addressed in other grievance responses; Baird advised Plaintiff to use HNRs to address his concerns with his HCP (id.).

On March 31, 2008, Salyer reviewed the pathology report from the March 2, 2008 biopsy; the diagnosis was basal cell carcinoma "extending to all margins," and complete excision was recommended (DSOF ¶ 70; PSOF ¶ 70). On April 3, 2008, after his request to view his medical records was granted, Plaintiff saw the pathology report (Doc. 1 at 6).

On April 7, 2008, Plaintiff wrote an inmate letter to Salyer, in which he stated that he saw the pathology report and recommendation; he asked what treatment would be provided and when, what were the dangers of waiting, and other questions (DSOF ¶ 72; PSOF ¶ 72).

Another biopsy on a suspicious lesion was done on April 10, 2008; this biopsy revealed basal cell carcinoma (DSOF ¶ 79; PSOF ¶ 79). On May 5, 2008, Plaintiff saw a specialist via telemedicine; surgery was recommended, and Plaintiff was scheduled for surgery (id.).

On May 14, 2008, Salyer documented in Plaintiff's medical record that he had been seen by Dr. Massey, a plastic surgeon, who recommended that the lesion on Plaintiff's left cheek and lower eyelid be excised and reconstructed; the plan for treatment was to request a plastic surgery consult for the excision and skin graft and consider a biopsy of a lesion on the nose at the follow-up appointment (DSOF ¶ 76; PSOF ¶ 76).

On May 30, 2008, McMorran sent an e-mail to Baird stating that Plaintiff had a list of questions he wanted reviewed (DSOF ¶ 78; PSOF ¶ 78).

On June 1, 2008, Dr. Crane issued a Special Needs Order for Plaintiff to have

long-sleeve shirts (Doc. 76 at 6 ¶ 1; <u>see</u> Ex. T6).[7]

On June 18, 2008, Plaintiff submitted an inmate letter stating he was diagnosed with skin cancer but was still not receiving appropriate care (DSOF ¶ 79; PSOF ¶ 79). In his June 25, 2008 response, Baird advised Plaintiff that pursuant to the specialist's recommendation, he was scheduled for surgery and would be taken to that appointment shortly (<u>id.</u>).

On June 27, 2008, McMorran sent an e-mail to Baird and stated that he spoke with Plaintiff (DSOF ¶ 80; PSOF ¶ 80). McMorran stated that Plaintiff was scheduled for surgery on July 3 with Dr. Massey; however, Plaintiff was persistent about speaking to a doctor about his questions (<u>id.</u>). McMorran expressed his concern about Plaintiff getting transported for surgery and then possibly refusing surgery (<u>id.</u>). Baird responded on June 30, 2008, recommending that the July 3 surgery be canceled and a telemed be set up within 2 weeks; if that could not be set up quickly, then he suggested sending Plaintiff for the procedure and see what transpires (DSOF ¶ 82; PSOF ¶ 82).

Plaintiff underwent surgery on his left cheek and lower eyelid on July 3, 2008 (DSOF ¶ 83; PSOF ¶ 83). The final pathology diagnosis was that all margins were free of tumors (<u>id.</u>).

On July 28, 2008, Plaintiff saw Dr. Massey via telemed for status post surgery; Dr. Massey indicated that Plaintiff was doing very well and recommended that he protect the scar from the sun for one year and follow-up as needed (DSOF ¶ 86; PSOF ¶ 86).

Meanwhile, on July 10, 2008, Plaintiff filed an inmate letter stating that in June he had turned in a uniform request form with a physician's order for long-sleeve shirts but had not received them (DSOF ¶ 130; PSOF ¶ 130). CO III Bell responded and told Plaintiff that he needed to see Grant-Ellis to receive that shirts (DSOF ¶ 131; PSOF ¶ 131).

---

[7]Within his PSOF, Plaintiff included 10 separate paragraphs of factual assertions under the heading "Excluded from Defendants' statement of facts" (Doc. 76 at 6-7 ¶¶ 1-10). Defendants did not object to or dispute any of these factual assertions in their reply (<u>see</u> Doc. 79).

On July 31, 2008, Plaintiff sent an inmate letter to CO III Bell stating that Grant-Ellis failed to respond to his HNR and when he saw her, she told him that she did not have any long-sleeve shirts (Doc. 76 at 2 ¶ 2).  On August 14, 2008, CO III Bell responded to Plaintiff that the shirts are currently not available, he was on a waiting list, and he would be notified when his order is received (id. ¶ 4).

Also on July 31, 2008, Plaintiff filed an inmate grievance (to appeal the July 10 inmate-letter response) about the shirts (id. ¶ 3).  On August 29, 2008, Plaintiff received a grievance response from Nurse Brenda Ortiz, who confirmed that Plaintiff had an order for long-sleeve shirts and that she would make sure an order form is given to supply for them to order the shirts (id. ¶ 5).  Plaintiff proceeded to file a grievance appeal to the Director on September 13, 2008 (id. ¶ 6).

On August 21, 2008, Slayer treated various spots of actinic keratosis on Plaintiff with liquid nitrogen—specifically, on his forearm, his nose, his back, and the back of his left leg (DSOF ¶ 88; PSOF ¶ 88).

On September 25, 2008, Plaintiff sent an inmate letter to Nurse Ortiz alerting her that he had still not received long-sleeve shirts and it had been four months since Dr. Crane issued the Special Needs Order (Doc. 76 at 6 ¶ 7).

On October 3, 2008, Plaintiff submitted an HNR to Grant-Ellis, stating that when another inmate was picking up his medical long-sleeve shirt, Plaintiff asked where his shirt was; Plaintiff wrote that Grant-Ellis responded that the doctor would have ordered them (id. ¶ 8; Ex. T7; DSOF ¶ 91; PSOF ¶ 91).  Grant-Ellis' response to this HNR was that "this is not what you were told" (id.).

On October 5, 2008, Plaintiff filed a grievance appeal supplement about the shirts and stated that he had still not received them despite the fact that Ortiz affirmed his grievance; he also stated that when he asked Grant-Ellis about the shirts, she was hostile (Doc. 76 at 6 ¶ 9; Doc. 70, Ex. J, Ex. 24).  Then, on October 19, 2008, Plaintiff sent another letter to Ortiz asking for help to obtain the long-sleeve shirts (Doc. 76 at 7 ¶ 10).

Plaintiff was issued the long-sleeve shirts on October 27, 2008 (DSOF ¶ 134;

1  PSOF ¶ 134).

2        On November 19, 2008, Salyer saw Plaintiff (DSOF ¶ 92; PSOF ¶ 92).  Plaintiff

3  reported some discomfort and facial spasm after the plastic surgery, but there was no

4  apparent distress.  Salyer assessed minimal nerve damage following surgery, and he

5  issued a Special Needs Order for a wide brim hat and long-sleeve shirts (id.).

6        **B.**    **High Cholesterol Treatment**

7        Prior to his incarceration, Plaintiff had a history of high cholesterol; in August

8  2005, his cholesterol was 195 and his triglycerides were 163 (DSOF ¶ 23; PSOF ¶ 23).

9  At that time, he was prescribed Zocor, which was changed to Mevacor shortly thereafter

10  (DSOF ¶¶ 24-26; PSOF ¶¶ 24-26).

11        On June 12, 2007, Salyer saw Plaintiff and noted that he was positive for

12  dyslipidemia (elevated plasma cholesterol, triglycerides, or both) (DSOF ¶ 35; PSOF

13  ¶ 35).  Salyer ordered fasting lab work to include a variety of blood tests (id.).  Salyer

14  noted that on June 22, 2007, Plaintiff's triglycerides were 231;[8] Salyer scheduled Plaintiff

15  to see the HCP for a prescription (DSOF ¶ 36; PSOF ¶ 36).

16        On July 6, 2007, Plaintiff's triglycerides were 485 (DSOF ¶ 37; PSOF ¶ 37).

17        Salyer saw Plaintiff on July 19, 2007, at which time they discussed his

18  dyslipidemia; treatment was to be diet, exercise, and a six-month prescription of Niacin

19  (DSOF ¶ 42; PSOF ¶ 42 (in part)[9]).  Plaintiff submitted an HNR a month later stating that

20  he stopped the Niacin because he developed a severe rash; he explained that his previous

21  doctor prescribed Zocor, which was successful (DSOF ¶ 44; PSOF ¶ 44).  On August 27,

22  2007, Salyer discontinued Niacin and started Plaintiff on Lopid (DSOF ¶ 45; PSOF ¶ 45).

23

24  _____

25        [8]According to the lab report, the limits for triglycerides are 0-149 (Doc. 70, Ex. D, Ex. 4).  The limits for total cholesterol are 100-199 (id.).

26

27        [9]Plaintiff disputes Defendants' assertion that "[Plaintiff] decided" what the treatment plan would be (DSOF ¶ 42); Plaintiff states that he could not decide what medications to take (PSOF ¶ 42).  Defendants assert that Plaintiff cites no evidence to support this disputed fact (Doc. 79 at 2).  The Court finds that because Plaintiff was a party to the July 19 discussion, he has sufficient personal knowledge to raise a dispute as to the events discussed.

28

On September 5, 2007, Plaintiff submitted another HNR stating that he stopped the Lopid because he developed a rash again; he requested a prescription for Zocor (DSOF ¶ 46; PSOF ¶ 46). On September 10, 2007, Salyer scheduled Plaintiff to see the HCP regarding the rash (DSOF ¶ 47; PSOF ¶ 47).

Plaintiff filed an inmate letter on September 13, 2007; this followed his HNR about the rash caused by different medications prescribed to treat his cholesterol (Doc. 70, Ex. E, Ex. 3). Plaintiff stated that he first alerted medical of the rash on July 27, 2007, and he requested he be given Zocor or be allowed to purchase it himself since that was successful for years prior to his incarceration (id.). In preparing a response to the inmate letter, PerezCerros spoke to Grant-Ellis, who advised him that the medical unit provided Plaintiff with a prescription drug suited to treat his condition, they did not have Zocor, and Plaintiff could not purchase medication other than that on the approved list (id.; DSOF ¶ 49).[10]

On October 11, 2007, Salyer reviewed Plaintiff's HNR that complained about unrelated conditions but that also stated he was not taking Lopid (DSOF ¶ 55; PSOF ¶ 55). Salyer assessed dyslipidemia and Plaintiff's Lopid and Niacin intolerance; he scheduled Plaintiff to see the HCP (id.). That same day, Salyer reviewed Plaintiff's lab work, which revealed that his triglycerides were 1015 (DSOF ¶ 56; PSOF ¶ 56).

On November 1, 2007, Salyer saw Plaintiff and assessed him with dyslipidemia; Salyer prescribed Mevacor, ordered a complete chemical panel and blood count in 60 days, and ordered Plaintiff to follow-up in 30 days (DSOF ¶ 58; PSOF ¶ 58).

On January 17, 2008, Plaintiff filed an inmate letter complaining that Salyer's November 1, 2007 directive to be seen in 30 days and have a blood test in 60 days was not followed (Doc. 70, Ex. E, Ex. 6; Ex. J, Ex. 15). In the February 1, 2008 response, CO III Bell stated that she spoke to Grant-Ellis, who advised that Plaintiff was placed on the

---

[10]Plaintiff disputes that they did not have Zocor; he notes that in November 2007, Salyer prescribed Mevacor, a statin drug very similar to Zocor, and in February 2008, Salyer prescribed Lovastatin, the generic for Zocor (PSOF ¶ 49). Defendants note that Lovastatin is actually the generic name for Mevacor, not Zocor (DSOF ¶ 26; see Doc. 79 at 8).

Doctor's Line (id., Ex. 16; DSOF ¶¶ 61, 142-143; PSOF ¶¶ 61, 142-143). Plaintiff then filed an inmate grievance on the issue (Doc. 70, Ex. J, Ex. 17). In his October 20, 2008 response, McMorran informed Plaintiff that he had been seen multiple times for his conditions and that some people struggle with their illness despite the efforts of providers and that a difference of opinion between providers is not uncommon (id., Ex. 12).

On January 29, 2008, Plaintiff filed an inmate letter addressed to Salyer; Plaintiff stated that he saw his lab results showing that his triglycerides were over 1000 and he asked Salyer if there could be prolonged damage if the levels remained that high (Doc. 70, Ex. D, Ex. 28). He also asked what action should be taken, whether his lab tests should be reviewed by a physician, and whether he should get another blood test given that the last test was in September 2007 (id.).

According to the medical records and the information gleaned from Plaintiff's grievance documents, on February 2, 2008, Dr. Phan saw Plaintiff and instructed him to stop taking Mevacor/Lovastatin and begin Zocor (DSOF ¶ 64; PSOF ¶ 64; Doc. 70, Ex. D, Ex. 29; Ex. J, Ex. 17). On February 11, 2008, Salyer reviewed this medical record and noted that Plaintiff had not had his fasting lipid panel blood tests done after he had started taking Mevacor (id.). Salyer met with Plaintiff and told him that Dr. Phan was in error and that Salyer was unaware that Plaintiff had not yet had blood tests as ordered (Doc. 70, Ex. J, Ex. 17). Plaintiff was put back on Lovastatin, and Salyer ordered fasting labs in 30 days (id.).

On February 18, 2008, Plaintiff wrote an inmate letter to Salyer asking about the proper dosage of his Lovastatin and his need for a blood test (DSOF ¶ 66; PSOF ¶ 66). Salyer responded on February 28, 2008, and told Plaintiff the amount of Lovastatin to take (DSOF ¶ 69; PSOF ¶ 69).

On February 20, 2008, Baird responded to Plaintiff's inmate letter about high cholesterol; he stated that appropriate staff had been contacted and Plaintiff would be scheduled to meet with his HCP to resolve the issue (DSOF ¶ 68; PSOF ¶ 68).

On March 31, 2008, Salyer reviewed Plaintiff's lab results from a March 7, 2008

blood draw; Plaintiff's triglycerides were 730 (DSOF ¶ 71; PSOF ¶ 71).

On August 7, 2008, Salyer renewed Plaintiff's prescription for Lopid and ordered blood tests (DSOF ¶ 87; PSOF ¶ 87).

On September 8, 2008, Salyer noted Plaintiff's lab results from an August 2008 blood draw; Plaintiff's cholesterol was 249 and his triglycerides were 459; Salyer ordered more tests and instructed Plaintiff to continue with Lopid (DSOF ¶ 89; PSOF ¶ 89).

On November 19, 2008, Salyer saw Plaintiff (DSOF ¶ 92; PSOF ¶ 92).  They reviewed Plaintiff's lab results, which showed decreased triglycerides from 1000 to 300 in the last year (id.).  Salyer assessed dyslipidemia and improved triglyceride level and he ordered more lab tests (id.).

On January 8, 2009, Plaintiff submitted an inmate letter to Salyer complaining that it had been six weeks since his last blood test and he had not been seen; Salyer responded that Plaintiff was scheduled for a follow-up visit, and he renewed the Lopid prescription (DSOF ¶¶ 93-94: PSOF ¶¶ 93-94).  On February 4, 2009, Salyer noted in Plaintiff's chart his lab results from a November 2008 blood draw; triglycerides had increased to 493; Plaintiff was scheduled for an appointment (DSOF ¶ 95; PSOF ¶ 95).

On February 9, 2009, Salyer saw Plaintiff and discussed testing with statin therapy and discontinuing Lopid for now (DSOF ¶ 96; PSOF ¶ 96).  Salyer assessed him with dyslipidemia, ordered blood work, and discontinued Lopid and prescribed Lovastatin (id.).

On April 16, 2009, Salyer ordered prescription renewals for Lovastatin and other medication given that Plaintiff was to be discharged from ADC in a month (DSOF ¶ 99; PSOF ¶ 99).  On May 7, 2009, Salyer reviewed Plaintiff's lab results, which indicated that his triglycerides were 316 (DSOF ¶ 100; PSOF ¶ 100).

Plaintiff was discharged on May 13, 2009 (DSOF 101; PSOF 101).

## V.     Analysis

### A.     Sufficiency of Complaint, Substantial Harm

Defendants contend that the allegations in Plaintiff's Complaint fail to raise

genuine issues of material fact and that Plaintiff must show he sustained a substantial injury (Doc. 69 at 8, 14).  Both arguments are specious.

Plaintiff was not required to present evidence and establish genuine issues of material fact in his pleading, as Defendants suggest.  <u>See</u> Fed. R. Civ. P. 8(a).  Further, in its Screening Order, the Court found that—contrary to Defendants' assertion—Plaintiff set forth "specific allegations regarding each Defendant" and sufficiently stated an Eighth Amendment claim against each Defendant (Doc. 7 at 3).

In support of their second argument, Defendants repeatedly cite to <u>Estelle v. Gamble</u> for the assertion that "[t]he indifference must be substantial, and the conduct must rise to a level of 'unnecessary and wanton infliction of pain'" (Doc. 69 at 14, citing 429 U.S. 97, 104--05 (1976); Doc. 79 at 3).  This confuses substantial indifference on the part of the defendant with substantial harm suffered by the prisoner.  In addressing the severity of harm suffered by a prisoner, <u>Estelle</u> held that the Eighth Amendment applies even to less serious cases where the "denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose."  429 U.S. at 103;[11] <u>see</u> <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1060 (9th Cir. 1992) ("a finding that the defendant's activities resulted in 'substantial' harm to the prisoner is not necessary") (overruled on other grounds, <u>WMX Techs., Inc. v. Miller</u>, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

To the extent that Defendants' argument concerns whether Plaintiff suffered further harm as a result of Defendants' alleged denial or delay of medical case, that is an element under the Eighth Amendment deliberate-indifference standard, which is considered in the analysis below.

**B.      Liability**

**1.  Eighth Amendment**

To prevail on an Eighth Amendment medical care claim, a prisoner must

---

[11]In <u>Estelle</u>, the plaintiff suffered severe back pain after injuring his back at his prison job.  429 U.S. at 100-101, 107.

demonstrate "deliberate indifference to serious medical needs." <u>Jett v. Penner</u>, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing <u>Estelle</u>, 429 U.S. at 104). There are two prongs to the deliberate-indifference analysis. First, a prisoner must show a "serious medical need." <u>Jett</u>, 439 F.3d at 1096 (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" <u>McGuckin</u>, 974 F.2d at 1059 (internal citation omitted). Examples of a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." <u>Id.</u> at 1059-60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. <u>Jett</u>, 439 F.3d at 1096. This second prong is met if the prisoner demonstrates (1) a purposeful act or failure to respond to a prisoner's medical need and (2) harm caused by the indifference. <u>Id.</u> Prison officials are deliberately indifferent if they deny, delay, or intentionally interfere with medical treatment. <u>Wood v. Housewright</u>, 900 F.2d 1332, 1334 (9th Cir. 1990). But a delay in providing medical treatment does not constitute an Eighth Amendment violation unless the delay was harmful. <u>Hunt v. Dental Dep't</u>, 865 F.2d 198, 200 (9th Cir. 1989) (citing <u>Shapley v. Nevada Bd. of State Prison Comm'rs</u>, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam)).

A mere difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference. <u>See</u> <u>Sanchez v. Vild</u>, 891 F.2d 240, 242 (9th Cir. 1989). Where doctors have chosen one course of action and a plaintiff contends that they should have chosen another course of action, the plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances, . . . and the plaintiff must show that they chose this course in conscious disregard of an excessive risk to plaintiff's health." <u>Jackson v. McIntosh</u>, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted).

Defendants make no argument that Plaintiff did not suffer from a serious medical

need.  See Jett, 439 F.3d at 1096.  Indeed, Defendants' own evidence reflects that both Plaintiff's skin cancer condition and high cholesterol warranted ongoing treatment, medication, and regular monitoring.  Thus, the deliberate-indifference analysis turns on whether each Defendant was deliberately indifferent to Plaintiff's serious medical need.

Liability hinges on each Defendant's participation in the alleged constitutional violation.  Larez v. City of Los Angeles, 946 F.2d 630, 645 (9th Cir. 1991).  Plaintiff must demonstrate personal participation in the violation or that each Defendant (1) exhibited "culpable action or inaction in the training, supervision, or control of his subordinates" and that action or inaction caused the constitutional injury; (2) "acquiesce[nced] in the constitutional deprivations of which [the] complaint is made"; or (3) showed a "reckless or callous indifference to the rights of others."  See id. at 645-46 (internal citations omitted).

### 2.  Baird

In his Complaint, Plaintiff alleged that Baird was responsible for the training and supervision of Salyer and Grant-Ellis and that he knew or should have known—given Plaintiff's complaints and grievances—about the deprivations of medical care but he failed to correct the problems (Doc. 1 at 27-29).

Defendants submit evidence to show that Baird's involvement with Plaintiff's medical care was limited to responding to three inmate letters and responding to an e-mail from McMorran about Plaintiff's surgery (Doc. 70, Ex. B, Baird Decl. ¶¶ 4-9 & Exs. 1-4). Baird acknowledges that through these inmate letters, Plaintiff informed him of his pre-cancerous skin lesions and dyslipidemia (id., Baird Decl. ¶¶ 4-6).  But Baird states that upon receipt of each inmate letter, PA Brand reviewed Plaintiff's medical records and advised Baird that medical staff were contacted and Plaintiff would be seen, that his issues were already addressed, and that treatment was provided (id.).  Baird stresses that he did not personally treat Plaintiff or supervise his medical care (id. ¶ 10).  Defendants also contend that Baird's response to McMorran's e-mail about Plaintiff questions prior to his skin cancer surgery demonstrates his concern about a possible delay in surgery (Doc.

69 at 10). They conclude that because Baird is sued solely because he is a supervisor and not because of his alleged actions or inactions, he cannot be liable under § 1983 (id.).

In his response, Plaintiff does not specifically address Defendants' argument pertaining to Baird, nor does Plaintiff present any further specific facts to support his claim against Baird. See Celotex, 477 U.S. at 324 (nonmovant must "go beyond the pleadings . . . and designate specific facts showing" a material factual dispute). Moreover, Plaintiff does not dispute any of the factual assertions or evidence that Defendants submit regarding Baird's involvement with Plaintiff (Doc. 76, PSOF ¶¶ 68, 77, 79, 81-82, 148).

Plaintiff therefore fails to establish a disputed material fact as to Baird's liability for deliberate indifference to either of Plaintiff's medical conditions. Summary judgment will be granted to Baird on both Counts I and II.

## 2. McMorran

Plaintiff alleged that as the FHA, McMorran knew or should have known of his duty to investigate claims of inadequate or substandard treatment and correct problems (Doc. 1 at 27). Plaintiff further alleged that McMorran failed to correct the problems or administer proper intervention to ensure the necessary treatment for Plaintiff's serious medical needs (id. at 27-28).

To support their claim that McMorran is not liable, Defendants submit his declaration, in which he explains that he is an administrator and not a licensed medical professional; he does not provide care, create medical policy, or prescribe treatment (Doc. 70, Ex. C, McMorran Decl. ¶¶ 1, 8). He states that he organizes and evaluates the healthcare delivery system for prisoners and plans cycles for scheduling medical providers, making adjustments as needed to ensure that services and coverage are met and there are no unreasonable barriers to inmates' access to healthcare (id. ¶¶ 3-4). Defendants submit that McMorran's involvement with the events underlying Plaintiff's claim was limited to (1) his responses to two inmate grievances, (2) three meetings with Plaintiff to discuss the grievances, (3) in February 2008, advising Central Office the

Plaintiff had not yet had surgery; (4) also in February, 2008, instructing Salyer to have Plaintiff scheduled for surgery with thirty days; and (5) in May and June 2008, e-mailing with medical staff about Plaintiff questions prior to his surgery (Doc. 69 at 10-11; Doc. 70, Ex. C, McMorran Decl. ¶¶ 22-27). Defendants argue that none of these actions could be construed as deliberate indifference (Doc. 69 at 11).

In response, Plaintiff raises arguments regarding McMorran's liability only as it relates to his skin cancer treatment (Doc. 75 at 3-4). Plaintiff asserts that McMorran failed to take corrective action to ensure that Plaintiff received the needed care that was ordered by Salyer (id. at 3). Plaintiff points to ADC policies specifying that the FHA is the "Responsible Health Authority," who is responsible for all levels of healthcare and for "providing quality accessible health services to all inmates" (id. at 3; Doc. 76, Ex. P-2). ADC policies also set forth that the FHA is responsible for triaging and making appointments for inmates, for ensuring compliance within the facility of inmate health maintenance, and for ensuring that adequate levels of staff are available to meet the applicable standard of care (Doc. 75 at 3; Doc. 76, Exs. P1-P4).

The relevant documentary evidence shows that in June 2007, Salyer referred Plaintiff for cryosurgery (Doc. 70, Ex. C, Ex. 7). Plaintiff's September 13, 2007 surgery appointment was cancelled (id.; Doc. 76, Ex. G2). In October 2007, McMorran received an inmate grievance complaining about the cancellation and the need to reschedule immediately (Doc. 76, Ex. G2). McMorran met in person with Plaintiff on October 23 and November 1 and 14, 2007, to address his concerns (Doc. 70, Ex. C, McMorran Decl. ¶ 15). McMorran's grievance response suggested to Plaintiff that he submit a new HNR to be seen so that he could be seen and rescheduled for the Derm Line (Doc. 76, Ex. M2). At either the November 14, 2007 meeting or in the December 18, 2007 grievance response, McMorran advised Plaintiff that he was rescheduled (Doc. 70, Ex. C, Ex. 3). But on February 14, 2008, Central Office Health Services contacted McMorran via e-mail to inquire whether Plaintiff had received the cryosurgery that had originally been scheduled for September 2007 (id., Ex. 7). McMorran informed Central Office that he

- 18 -

had not yet received surgery; to which he received a February 20, 2008 e-mail from PA Brand directing McMorran to schedule Plaintiff for cryosurgery within 30 days (id., Ex. 8). McMorran forwarded this e-mail directive to Salyer and asked him to schedule Plaintiff for the surgery by March 21, 2008 (id.). Plaintiff received a biopsy of his left cheek in March 2008, which revealed that he had basal cell carcinoma (Doc. 70, DSOF ¶ 70). Plaintiff received surgery on his left cheek and lower eyelid basal cell carcinoma in July 2008 (Doc. 70, DSOF ¶ 83).

As stated, to establish deliberate indifference, Plaintiff must demonstrate that McMorran acted purposefully or failed to respond to Plaintiff's medical need. Jett, 439 F.3d at 1096. Salyer's June 2007 referral for cryosurgery did not indicate any particular urgency (see Doc. 70, Ex. C, Ex. 7). Although Plaintiff wrote in his October 2007 grievance that the canceled cryosurgery needed to be rescheduled immediately due to his "potentially life threatening condition," there is no evidence that, in the fall of 2007, Salyer or any other medical professional deemed Plaintiff's condition as requiring emergency care (Doc. 76, Ex. G2). Defendants have established that McMorran is not a medical professional; thus, he could not be expected to recognize whether Plaintiff may have had an urgent need for cryosurgery. See Meloy v. Bachmeier, 302 F.3d 845, 849 (8th Cir. 2002) ("[t]he law does not clearly require an administrator with less medical training to second-guess or disregard a treating physician's treatment decision").

Moreover, the record shows that McMorran did not ignore Plaintiff's concerns about the canceled cryosurgery; rather, he met in person with Plaintiff and advised Plaintiff how to proceed to be rescheduled (see Doc. 76, Ex. M2). And in the spring of 2008, McMorran responded to a directive from the Central Office and ensured that Plaintiff was scheduled for surgery in March 2008 (Ex. 70, Ex. C, Ex. 8). At most, Plaintiff may be able to establish some negligence on McMorran's part in failing to schedule the surgery sooner, but there is no evidence of a "deliberate indifference" state of mind requirement. See Toguchi v. Chung, 391 F.3d 1051, 1060-61 (9th Cir. 2004) (neither medical malpractice nor negligence is sufficient to establish a constitutional

- 19 -

violation).  Consequently, Plaintiff cannot demonstrate deliberate indifference as to McMorran.

Moreover, McMorran is only liable if his conduct resulted in harm to Plaintiff. Jett, 439 F.3d at 1096.  Since his release from prison, Plaintiff has been seen twice by private physicians for his skin cancer, and those physicians found that his scars were healing well with no significant findings upon further exam (Doc. 69 at 14-15).  Plaintiff asserts that during the delay between the referral for cryosurgery and the actual surgery, his untreated pre-skin cancer progressed to skin cancer, which required painful surgery and left him with facial scarring (Doc. 75 at 8).  He presents no competent medical evidence, however, that the delay caused the skin cancer or that he would not have developed the skin cancer if the cryosurgery had not been delayed.  Further, Plaintiff initially sought evaluation of a precancerous lesion on his nose, not on his left cheek, and the record does not show that the skin cancer excised from Plaintiff's left cheek and lower eyelid formed in the same location or resulted from the precancerous lesion intended to be removed by cryosurgery.

Plaintiff therefore fails to establish a disputed material fact as to McMorran's liability for deliberate indifference to either of Plaintiff's medical conditions.  Summary judgment will be granted to McMorran on both Counts I and II.

### 3.  Grant-Ellis

Plaintiff alleged that Grant-Ellis made arbitrary decisions about who she would approve to be seen by an HCP and denied Plaintiff access to proper medical care and treatment (Doc. 1 at 23-24).  He alleged that she ignored numerous complaints about inadequate treatment despite knowledge of the serious medical conditions he suffered from (id. at 24).

### a.  Skin Cancer on Face

The record documents that Grant-Ellis was contacted by the CO III for information needed to respond to Plaintiff's inmate letter complaining about the September 13, 2007 cancelled appointment (Doc. 70, Ex. E, Grant-Ellis Decl. ¶ 4).  Grant-Ellis informed the

CO III that if Plaintiff had followed directions, he would have been scheduled for the next Derm Line, and she told the CO III to instruct Plaintiff to submit an HNR to request treatment (id.). There is no indication or evidence that Plaintiff failed to follow any directions regarding his September 13 appointment. Indeed, Plaintiff was informed by McMorran that his September 13 appointment was cancelled because the provider was called to another unit. And, as Plaintiff notes, pursuant to ADC policy, if medical personnel are unable to see an inmate scheduled for that day, the inmate will be rescheduled as early as possible (Doc. 75 at 5; Doc. 76, Ex. M1). Thus, the information Grant-Ellis provided was incorrect, and Plaintiff should not have had to submit a new HNR to get treatment.

It appears that Grant-Ellis' only other involvement with treatment for Plaintiff's skin cancer on his face was following his surgery, when she responded to his July 22, 2008 HNR complaining about the lack of post-surgery consultation; Grant-Ellis informed him that the consult did not recommend a follow-up (Doc. 70, Ex. E, Grant-Ellis Decl. ¶ 12 & Ex. 9). This, too, was incorrect, because on July 28, 2008, Dr. Massey saw Plaintiff for a post-surgery follow-up (id., DSOF ¶ 86).

This review shows that Grant-Ellis gave incorrect responses to Plaintiff's inquiries about his skin cancer treatment, and the inference from this evidence is that she made no effort to investigate the issues and was indifferent to Plaintiff's medical concerns. However, these actions were limited to two isolated incidents. Isolated incidents of neglect may constitute grounds for malpractice, but they do not amount to a constitutional violations. O'Loughlin v. Doe, 920 F.2d 614, 617 (9th Cir. 1990); see Toguchi, 391 F.3d at 1060-61.

### b. Long-Sleeve Shirts

On June 1, 2008, Dr. Crane issued a Special Needs Order for Plaintiff to have long-sleeve shirts (Doc. 76 at 6 ¶ 1; <u>see</u> Ex. T6).[12]  Plaintiff did not receive the long-sleeve shirts until October 27, 2008 (Doc. 70, DSOF ¶ 134).

Plaintiff made numerous attempts through HNRs and the grievance system to obtain the shirts.  Grant-Ellis' responses to Plaintiff's pleas for long-sleeve t-shirts included the following: (1) in response to Plaintiff's July 10, 2008 inmate letter, Grant-Ellis advised the responding CO III that Plaintiff would have to see her to receive shirts (Doc. 70, DSOF ¶ 131); (2) in a July 31, 2008 inmate letter, Plaintiff informed the CO III that he tried to contact Grant-Ellis but she did not respond to his HNR, so he asked her about the shirts in person, and she told him that she did not have any and would not order any and she sent him away  (<u>id.</u>, Ex. T10; Doc. 76 at 6 ¶ 2) (3) in response to his October 3, 2008 HNR, in which he asked that Grant-Ellis please contact the necessary office to expedite his shirts order, she responded by denying that she told him "the doctor would have ordered them," and did not address his request to contact the appropriate office (Doc. 70, Ex. E, Grant-Ellis ¶ 13 & Ex. 10).

The undisputed facts demonstrate that Grant-Ellis knew or should have known that Plaintiff was medically authorized to receive long-sleeve shirts; Grant-Ellis was in part responsible for providing the shirts; Grant-Ellis knew that Plaintiff did not receive the shirts; she did not provide him the shirts; and she failed to respond to or provided callous responses to his inquires about getting the shirts.  This record is more than sufficient to establish a genuine issue of material fact whether Grant-Ellis acted with a "reckless or callous indifference" to Plaintiff's medical need.  See <u>Larez</u>, 946 F.2d at 646 (9th Cir.

---

[12]As noted previously, on June 12, 2007, Salyer authorized that Plaintiff be issued long-sleeve shirts in light of his diagnosis of actinic keratosis on his arms (Doc. 70, DSOF ¶ 35).  In his response, Plaintiff argues that he did not receive a long-sleeve shirt pursuant to Dr. Crane's June 1, 2008 Special Needs Order (Doc. 75 at 5-6; <u>see</u> Doc. 76 at 6 ¶¶ 1-9).  Thus, Plaintiff's claim regarding the long-sleeve shirt appears to relate solely to the failure to obtain a shirt following Dr. Crane's 2008 order.

1991).

Grant-Ellis may only be liable for deliberate indifference, however, if her actions caused Plaintiff further harm. See Hunt, 865 F.2d at 200. As mentioned, on August 21, 2008, Slayer treated a spot of actinic keratosis on Plaintiff's forearm with liquid nitrogen (DSOF ¶ 88). But Plaintiff does not allege that this spot of actinic keratosis stemmed from the lack of long-sleeve shirts after Dr. Crane's June 1, 2008 Order. Also, there is nothing in the record to show that this spot became cancerous or that Plaintiff has any other cancerous or precancerous lesions on his arms. Given that Plaintiff was diagnosed with actinic keratosis on his arms in June 2007, when Salyer first examined him, the presence of actinic keratosis in August 2008 does not indicate a progression of the condition. Consequently, Grant-Ellis is not liable because there is no showing of further harm caused by her indifference to Plaintiff's medical need.

Summary judgment will therefore be granted to Grant-Ellis on Count I.

### c. High Cholesterol

There appear to be just three occasions when Grant-Ellis had direct involvement with Plaintiff's high cholesterol treatment. She provided information to CO III PerezCerros to respond to Plaintiff's September 13, 2007 inmate letter, in which he complained about the rash that developed as a result of his cholesterol medication (Doc. 70, DSOF ¶ 49). Grant-Ellis told PerezCerros that Plaintiff was "provided with a prescription drug that is suited to treat [his] medical condition" (id., Ex. E, Grant-Ellis Decl. ¶ 5 & Ex. 3). The record shows that Plaintiff was seen by Salyer a couple weeks later, on November 1, 2007, to address the medication issue ((DSOF ¶ 58; PSOF ¶ 58).

In January 2008, Grant-Ellis was contacted in response to Plaintiff's inmate letter that complained she was not complying with a medical directive issued by Salyer that Plaintiff be seen for follow-up 30 days after the November 1 appointment and that his blood be tested in 60 days (Doc. 70, Ex. E, Grant-Ellis Decl. ¶ 8; DSOF ¶ 143). Grant-Ellis advised that she placed Plaintiff on the Doctor's Line; he was seen by Dr. Phan on February 2 and then by Salyer on February 9, 2008 (id., DSOF ¶¶ 64, 96; PSOF ¶ 64;

Doc. 70, Ex. D, Ex. 29; Ex. J, Ex. 17).

Lastly, on April 9, 2009, Plaintiff submitted an inmate letter to Grant-Ellis requesting medications; she forwarded the inmate letter to Salyer, who ordered the prescriptions (id., DSOF ¶¶ 98-99; Doc. 76, PSOF ¶¶ 98-99).

None of these incidents evinces deliberate indifference by Grant-Ellis. Although the record shows that Grant-Ellis had the ability to schedule inmates to see HCPs (see Doc. 70, Ex. E, Grant-Ellis Decl. ¶ 8), Plaintiff does not set forth sufficient facts or evidence to show that she failed to schedule him for appointments ordered by Salyer or that she delayed treatment for his high cholesterol. Summary judgment will therefore be granted to Grant-Ellis on Count II.

### 4. Salyer

Plaintiff alleged that Salyer denied or impeded Plaintiff from receiving necessary medical care for skin cancer and high triglyceride levels (Doc. 1 at 24-25). Plaintiff also claimed that Salyer failed to follow-up to ensure that prescribed treatment was provided (id. at 25).

### a. Skin Cancer Treatment

Defendants argue that Salyer is not supervisor, he does not schedule inmates to be seen by an HCP, and he did not ignore Plaintiff's inmate letters or HNRs (Doc. 69 at 12-13). They contend that, according to Plaintiff's medical records, Salyer frequently reviewed and made notations in Plaintiff's file (id. at 13).

Plaintiff asserts that Salyer could have ensured that Plaintiff received that treatment that Salyer himself ordered, but he failed to do so (Doc. 75 at 4). Plaintiff also contends that the evidence shows that Salyer could schedule inmates to be seen, as demonstrated by Defendants' evidence showing that in response to a directive from the Central Office, Salyer was instructed to schedule Plaintiff for surgery (id., ref. to Doc. 70, DSOF ¶ 67).

The record shows that after his June 12, 2007 authorization for cryosurgery, Salyer repeatedly saw Plaintiff in person, reviewed his medical records, and received

communications regarding Plaintiff's surgery or his actinic keratosis condition.[13]  Further, although Defendants state that Salyer did not schedule medical appointments (Doc. 69 at 12; Doc. 79 at 7), the evidence reflects that he routinely scheduled Plaintiff for the Derm Line or to be seen by an HCP (see Doc. 70, DSOF ¶¶ 35-36, 47, 55, 67, 96).  Although it can be inferred that Salyer was aware that the cryosurgery was delayed, it cannot be inferred from this record that he had the authority to make it happen within a specific time frame.

In addition, the evidence that Salyer regularly treated Plaintiff militates against a finding that Salyer disregarded Plaintiff's medical needs; instead, it suggests that the delay in cryosurgery was merely an "isolated" incident in Plaintiff's treatment.  There is no evidence that Salyer purposely delayed surgery to increase the harm and pain to Plaintiff; thus, the nature of this isolated incident does not rise to the level of deliberate indifference.  See Wood, 900 F.2d at 1334.

Moreover, Salyer is only liable if such a failure resulted in harm to Plaintiff.  Jett, 439 F.3d at 1096.  As previously analyzed with respect to McMorran's conduct, Plaintiff has not established that Salyer's conduct resulted in harm to Plaintiff.  Summary judgment will therefore be granted to Salyer on Count I.

**b.  High Cholesterol Treatment**

Plaintiff contends that when Salyer reviewed the lab results indicating that Plaintiff's triglycerides were 1015, he discontinued Lopid and failed to order a replacement medication (Doc. 75 at 4).  But the evidence shows that the same day Salyer reviewed those lab results, he scheduled Plaintiff to see an HCP to manage his dyslipidemia (Doc. 70, DSOF ¶ 55).  And a few weeks later, Salyer saw Plaintiff and

---

[13]November 1, 2007, Salyer examined Plaintiff (DSOF ¶ 58); December 20, 2007, he spoke to Plaintiff on the yard (Doc. 70, Ex. D, Ex. 26); February 11, 2008, he reviewed medical records and met with Plaintiff (DSOF ¶ 64; Doc. 70, Ex. D, Ex. 29; Ex. J, Ex. 17); February 20, 2008, he received e-mail that he must schedule the cryosurgery (DSOF ¶ 67); February 28, 2008, he responded to an HNR (DSOF ¶ 69); March 31, 2008, he reviewed Plaintiff's pathology report (DSOF ¶ 70; PSOF ¶ 70).

prescribed Mevacor and more lab work (id. ¶ 58).  Plaintiff's triglycerides were 730 in

March 2008 (id. ¶ 71), and down to 459 in August 2008 (id. ¶ 89).

More importantly, the evidence shows that during Plaintiff's two-year

confinement, Salyer saw Plaintiff for his high cholesterol on at least six occasions (Doc.

70, DSOF ¶¶ 35, 42, 58, 64, 92, 96); he scheduled Plaintiff to see an HCP for high

cholesterol treatment twice (id. ¶¶ 47, 56); he reviewed Plaintiff's lab results to monitor

triglyceride levels six times (id. ¶¶ 36-37, 56, 71, 89, 100), and he adjusted Plaintiff's

high cholesterol medication seven times (id. ¶¶ 45, 64, 69, 87, 95-96, 99).  Plaintiff's

cholesterol fluctuations and ongoing need to adjust medication continued even after his

release from prison when his triglycerides rose above 500; thus, requiring his private

physician to change his prescription again (Doc. 69 at 15; Doc. 70, DSOF ¶¶ 102-104;

Doc. 76, PSOF ¶¶ 102-104).

While Plaintiff may have disagreed at times with the medication Salyer prescribed

for high cholesterol, there is no evidence to demonstrate that the course of treatment

Salyer chose was "medically unacceptable under the circumstances" or that Salyer

disregarded an excessive risk to Plaintiff's health.  See Jackson, 90 F.3d at 332.  In short,

Plaintiff presents nothing more than a difference of opinion as to the appropriate

medication that should have been prescribed for his high cholesterol.  Because this is

insufficient to establish deliberate indifference, summary judgment will be granted to

Salyer on Count II.

**5. Schmidt**

The last Defendant is Schmidt, whom Plaintiff alleged interfered with the

grievance process and thereby caused delays in medical care (Doc. 1 at 28-29; Doc. 75 at

4).

Defendants argue that Plaintiff cannot show that Schmidt possessed the culpable

state of mind to support a deliberate-indifference claim (Doc. 69 at 12).  They also

contend that Schmidt did not respond to medical grievances, which are forwarded to the

FHA, and that Plaintiff had access to and utilized the grievance process (id.).

Plaintiff's arguments against Schmidt relate solely to his claim in Count I (Doc. 75 at 4). He submits that Schmidt interfered with the grievance process on three occasions (id.). The first was Schmidt's response to Plaintiff's December 9, 2007 grievance appeal regarding the failure to get cryosurgery; Schmidt informed Plaintiff that the FHA had not yet responded to Plaintiff's grievance so he could not file an appeal yet (Doc. 76, Ex. S1). The second occurrence was Schmidt's response to Plaintiff's December 11, 2007 inmate letter in which Plaintiff stated that he filed the grievance appeal because the FHA did not response within 30 days as required by the grievance policy; Schmidt again told Plaintiff that he had to wait until the FHA responded (id., Ex. S2). The last occurrence was Schmidt's response to Plaintiff's grievance supplement that he filed on January 9, 2008, on the same issue and for the stated reason that he still had not received any response from the FHA; Schmidt repeated that Plaintiff had to wait for a response from the FHA (id., Ex. S3).

Plaintiff is correct that under the ADC grievance policy, when he did not receive a grievance response from the FHA after 30 days, he was entitled to proceed to the next level and file an appeal (id., Ex. J, Ex. 1 (Dep't Order 802.11 § 1.2.1.2); DSOF ¶ 119). But Schmidt's failure to follow ADC procedures does not amount to indifference to Plaintiff's medical needs. The record shows that the FHA responded to the grievance at issue on December 18, 2007, and that Plaintiff then filed an appeal to the Director on December 31, 2007 (Doc. 70, Ex. J, Ex. 6). Thus, there was no significant delay in the grievance process (apart from the FHA's over 60-day delay in responding to the grievance). And a failure to adhere to department policy, standing alone, does not rise to a constitutional violation.

For these reasons, summary judgment will be granted to Schmidt on both Counts I and II.

Because summary judgment will be granted to all Defendants on all of Plaintiff's claims, issues regarding damages and qualified immunity are moot.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 69) and Motion to Strike (Doc. 81).

(2) Defendants' Motion to Strike (Doc. 81) is **denied**.

(3) Defendants' Motion for Summary Judgment (Doc. 69) is **granted**.

(4) The Clerk shall enter judgment in favor of Defendants and that the Plaintiff take nothing.  The Clerk shall terminate this action.

DATED this 23rd day of September, 2011.

_____
Neil V. Wake
United States District Judge